JUDGE PRESKA

09 CV 2842

PRYOR CASHMAN LLP
Perry M. Amsellem
pamsellem@pryorcashman.com
Robert W. Ray
rray@pryorcashman.com
410 Park Avenue
New York, New York 10022
Telephone: (212) 421-4100
Fax: (212) 798-6315

RECEIVED
MAR 2 5 2009
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                              :
THE DEDALUS FOUNDATION                        :   CIV. No. _____
                                              :
                        Plaintiff,            :
                                              :
                                              :   **COMPLAINT**
          -against-                           :   (Jury Trial Demanded)
                                              :
JOAN BANACH                                   :
                                              :
                        Defendant.            :
-------------------------------------------------------X

Plaintiff the Dedalus Foundation (the "Plaintiff" or "Dedalus"), by and through its

attorneys Pryor Cashman LLP, as and for its Complaint against Defendant Joan Banach

("Banach" or "Defendant") alleges upon information and belief as follows:

## INTRODUCTION

1.  This is a complaint alleging breach of fiduciary duty, self dealing, theft of corporate

opportunities, conversion, replevin and computer fraud, arising from the wrongful acts of

defendant Joan Banach, the office secretary of a celebrated internationally renowned artist,

Robert Motherwell, who had unfettered access to Motherwell's works, studios and archives.

While an employee and Board Member of Dedalus, Motherwell's Foundation, Banach had the

responsibility to inventory and assign studio numbers to all of Motherwell's works, but was

840841

caught selling, in a most surreptitious and deceptive manner, undocumented Motherwell works over which she has no valid claim of right, and without ever having disclosed the existence of such Motherwell works, much less her consignment and sales thereof, to the Dedalus Foundation, despite her fiduciary obligations to do so.

## FACTS COMMON TO ALL CLAIMS

2.  Plaintiff the Dedalus Foundation, originally named the Motherwell Foundation, was formed in March 1981 and is a non-stock charitable Corporation incorporated in and organized under the laws of Connecticut, with sole offices at 555 West 57th Street, Suite 1222, New York, New York, 10019.  Dedalus did not become active until in or about January 1992, after Motherwell's death, and never routinely conducted business in or from Connecticut.

3.  Soon after Motherwell's death in July 1991, Dedalus leased offices in January 1992 in Bedford Hills, New York, and thereafter Dedalus began its routine business operations from this office location.  Dedalus thus did virtually no business in the state of Connecticut and all conversations, acts and conduct relevant to this action took place in New York.  In or about 1996, Dedalus leased its present principal offices at 555 West 57th Street.

4.  Defendant Joan Banach is a natural person, with a residence at 55 Bethune Street, Apartment 324A, New York, New York 10014, and who was both an employee and a Member of the Board of Directors of the Dedalus Foundation.  This action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the common law of the State of New York.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, governing federal question jurisdiction, and 28 U.S.C. § 1367, governing supplemental jurisdiction. This Court has personal jurisdiction over Defendant because the Defendant does business and resides in the State of New York. Venue is proper pursuant to 28 U.S.C. § 1391(b)

as (1) defendant Joan Banach resides in the Southern District of New York; (2) a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York; and (3) a substantial part of property that is the subject of the action is situated in the Southern District of New York.

5. Robert Motherwell ("Motherwell") was an esteemed American modern abstract expressionist fine artist who lived from January 24, 1915 through July 16, 1991 and whose artistic works can be found in major museums throughout the world. Motherwell founded the Dedalus Foundation during his lifetime. The purpose of Dedalus includes: fostering public understanding of modern art and modernism by facilitating research, education, publications, and exhibitions in this field; collecting, preserving and arranging Motherwell's art for public exhibition; donating works of art to museums, schools, colleges and universities; providing financial assistance to modern art scholars; and importantly, raising funds by selling works of art owned by Dedalus. Dedalus owns the copyrights to all of Motherwell's works in all mediums, and maintains and inventories all pieces it owns, and documents all Motherwell works which it sells, as well as works that Dedalus locates through its ongoing research.

6. It is the policy of Dedalus to request that its employees and Board Members disclose to Dedalus any Motherwell works they claim to own, and to never remove works owned by Dedalus from the premises without permission.

7. Joan Banach began employment as Motherwell's office secretary on or about March 16, 1981, where one of her main responsibilities was to catalogue all of his works with studio numbers. Banach's role developed into one of "curator", both while Motherwell was alive and especially after Motherwell's death, as she maintained control and responsibility over Dedalus' inventory for many years. Motherwell trusted Banach with all of his keys that gave her full

access to his home, office, library, studio, storerooms, and archive rooms all year round, even when he was away. However, Banach had never been Motherwell's studio assistant, who had been Mel Paskell. Subsequent to Motherwell's passing in 1991, Banach became an at-will employee and subsequently a Member of the Board of Dedalus. At Dedalus, Banach had 24/7 unfettered and unsupervised access to its offices, inventory, all Motherwell works, archives, and storage facilities, including security codes. One of Banach's main responsibilities at Dedalus was to assist in organizing and inventorying all of Motherwell's works and later to assist in creating Motherwell's Catalogue Raisonné, which is the historical and chronological monograph comprehensively cataloging all of Motherwell's works, including their provenance. Banach, like all the other Board Members and employees of Dedalus, had a fiduciary obligation to disclose any Motherwell works she claimed to have rightful ownership of, and an obligation to provide Dedalus with any and all information and knowledge about the whereabouts and provenance of any and all Motherwell works.

8. That was particularly true where Banach's duties, as both an employee and Board Member, included, among other things, maintaining and controlling the Motherwell inventory on the studio cards, which were 5 x 8 inch inventory cards used in Motherwell's studio beginning around 1977, and which contained information such as Polaroid photos, sales, consignments, provenance and inventory numbers. The inventory number usually conveyed the year and medium of the work, as well as an accession number. In the 10 years between 1981 until Motherwell's death in 1991, Banach was solely responsible for inventorying Motherwell's works and assigning them studio inventory numbers. In addition, in the early days of Dedalus, Banach assisted in pricing the works, as well as in selling and loaning Motherwell's works to galleries and museums.

9. Banach played an integral role in cataloguing and inventorying the Motherwell works owned by Dedalus. As Dedalus' "curator", Banach controlled the Dedalus inventory and for many years supplied and supervised the inventory records of the collection, which formed the basis of the audit information that Dedalus was required to give its accountants. Banach was very much the manager of Dedalus' collection of close to ten thousand original works and she personally recommended the employees who Dedalus hired below her. Eventually her role at Dedalus evolved into helping put together the Catalogue Raisonné of Motherwell's work. One of the principal goals of Dedalus has been to sponsor a Motherwell Catalogue Raisonné. The Catalogue Raisonné project became very active by January 2002, and Katy Rogers, who had been hired as a researcher in January 2003, became its Project Manager in August 2005. Joan Banach was also a member of the Catalogue Raisonné Scientific Committee.

10. Banach acted as Dedalus' "collections manager" and for years supplied audit information to Dedalus' accountants.

11. Since at least 1999, Banach allegedly worked from home and rarely ever came to work at the office, except when it suited her. Banach did not get along with many Foundation employees. She was notorious for doing very little work, despite her hefty salary, and intimidated other employees by claiming authority based on her alleged past friendship with Motherwell. She personally recommended individuals to be hired to work beneath her, and was responsible for instigating the dismissal of Mel Paskell, Motherwell's long-time studio assistant, and for hiring his replacement without consulting any other member of Dedalus. Banach falsely represented to Dedalus that she worked from home allegedly using the remote internet access software which Dedalus had made available to her to perform her employment and Board duties, i.e., specifically to access the Catalogue Raisonné database. However, Banach revealed to

Dedalus on August 12, 2008 that for roughly a year and a half her remote access software had not been working. In short, Banach was unjustly taking a salary in excess of $100,000.00 per year and falsely representing to her employer and fellow Board Members that she was carrying out her employment and Board-related responsibilities, when in fact she was not.

12. Dedalus eventually became suspicious of her secrecy and furtive actions, having reason to believe she was concealing Motherwell's works and archival material from the Catalogue Raisonné process. In 2005, Dedalus discovered that Banach took Motherwell works home without authorization, including his valued Metropolitan Museum Sketchbook, as well as documentation pertaining to his house in East Hampton designed and built by Pierre Chareau. She was observed surreptitiously returning these materials to Dedalus.

13. Also in 2005, a valued Motherwell "Elegy" drawing was discovered missing from Dedalus' collection and many at Dedalus suspected Banach had taken it home. Dedalus undertook a careful and thorough search of Banach's office, and in so doing Dedalus discovered two unframed Motherwell "Lyric Suite" drawings which were improperly stowed away in Banach's office, without authorization, but the "Elegy" drawing most certainly was not in her office. After Board Members of Dedalus asked Banach about Motherwell's "Elegy" drawing, however, the drawing subsequently and furtively reappeared. While Banach claimed that the drawing had been in her office the whole time, Dedalus knew this claim to be false, since it had searched her office very thoroughly, including all of her files as well as all surfaces and drawers.

**Dedalus First Discovers Joan Banach is Surreptitiously Selling Undocumented Motherwell's Works for Which Dedalus had No Record of Existence**

14. In July 2008, Christie's, the fine art auction house, sent an e-mail to Dedalus' Catalogue Raisonné Project Manager, Katy Rogers, with pictures and supporting documentation of works by Motherwell which Christie's intended to include in its September Ninth sale.

15. Among these works were two ink and pencil drawings from 1958, a crucially important transitional year in Motherwell's development as an artist.

16. As is typically done when Dedalus gets news of a Motherwell work that was previously unknown and has no firmly established provenance, Rogers asked Christie's to have the consignor of the works contact Dedalus to discuss its provenance. To everyone's surprise, the consignor refused to respond to Dedalus when asked to do so. This is very unusual.

17. On August 5, 2008, Rogers and Jack Flam, the President of Dedalus, went to Christie's to see the works. The works were visibly torn from a spiral pad that had paper with curved corners and had unusual imagery. The works had no previous provenance and were listed as acquired directly from the artist. The imagery in the works was unusual; one of the drawings seemed overtly figurative at a time when Motherwell's imagery was usually understood to be increasingly abstract. What raised further suspicion was that the matting and framing were clearly very new, despite the fact that the drawings were already fifty (50) years old. Moreover, no one from Dedalus remembered having seen Motherwell works for sale which were visibly torn out of a spiral sketch book and which were on paper with rounded rather than right-angled corners. Because the imagery, the new matting and frame, and the paper edges were so unusual, and because the consigner had refused to contact Dedalus despite requests from Christie's to do so, Flam and Rogers told Emmy Salama-Caro, a representative from Christie's, that they had doubts about the authenticity of the drawings and would like to have another Foundation Board Member examine them.

18. That same day, Flam returned to Dedalus office and phoned Joan Banach at home to ask her to go to Christie's to examine the works in question. Banach first seemed startled and asked whether Flam had already been down to Christie's and had examined the work. When

Flam confirmed that he had, Banach expressed concern and responded that she did not want to go to Christie's. Upon questioning, Banach hesitantly stated that she knew that the works were authentic, despite the unusual paper. When questioned further by Flam, Banach stated that the drawings had come from a Canson Croquis spiral-bound sketchbook that Motherwell used during the summer of 1958 -- 23 years before Banach even began working for Motherwell. After even further questioning, Banach stubbornly revealed that she knew this information and that the works were authentic because it was Banach herself who had secretly consigned them to Christie's, claiming for the first time in the 17 years she had worked for Dedalus that the works were purportedly hers. Banach, in further breach of her fiduciary duties to Dedalus, incredibly asked Flam not to mention any of this to the others at Dedalus. Remarkably, Banach called back that day to express her main concern -- whether Christie's now thought that the drawings she secretly consigned were forgeries and whether the sale would go through at auction. In short, Banach was most concerned about the money.

19. Banach also clearly stated to Flam that she possessed other drawings from the same Canson Croquis spiral-bound sketchbook from which these same consigned works had been torn. Flam conveyed Banach's admission to some other Board Members shortly after hanging up with Banach, given Flam's substantial shock and extreme stress over these events and Banach's admissions.

20. Flam was completely shocked by Banach's failure to deal with Dedalus and its Board in an honest, open and disinterested manner, as required by her fiduciary duties. Where Dedalus also sells Motherwell works and is compiling a Catalogue Raisonné, even if the works had been legitimately obtained by Banach -- which they were not -- Banach's self-interest, self-dealing, conflict of interest and dishonesty constituted a complete breach of her fiduciary duties.

Moreover, as requested from all Dedalus employees and Board Members, Dedalus had requested, on more than one occasion, that Banach disclose to Dedalus any and all original Motherwell works allegedly owned by her, and Banach had never disclosed any such ownership to Dedalus despite such requests. In addition, Dedalus' reputation was now damaged as a result of Banach's failure to disclose such material facts, because Flam, acting as the President of Dedalus, together with Dedalus' Project Manager of the Catalogue Raisonné, had raised questions to Christie's about the authenticity of Motherwell works unknowingly consigned to Christie's by Dedalus' own long time Board Member, Banach. It made Dedalus, Flam and Rogers appear unprofessional and incompetent, inasmuch as Dedalus and its President did not even know of the existence of Motherwell works consigned by one of its own long-time Board Members. Moreover, the nature of Banach's surreptitious and misleading behavior was simply inexplicable. Obviously, if the works had been obtained legitimately, there would have been no need for 17 or more years of secrecy and deception. Indeed, Christie's had repeatedly pushed Banach, as the consigner, to contact Dedalus, but Banach -- Dedalus' own Board Member -- refused to do so.

21. Now, Flam demanded that Banach provide him with a list of all the works by Robert Motherwell that she claimed to currently own or that she claimed to have had owned in the past, with detailed information of how Banach came into possession of these works, and what had been sold and to whom.

22. On August 8, 2008, Flam sent an e-mail to Banach outlining the information which Dedalus requested from Banach concerning the current and former Motherwell works she claimed to have owned:

> For all of the works by Motherwell currently in your possession, please give the
> following information: title; medium and support; size; date; signatures and/or

dedications; studio identification numbers, if any. Also please append an image of each (a digital camera image is fine, snapshot quality, just to provide a visual record.) Please also list any works by Motherwell that you have owned that have already been sold, giving the same information as above, as well as you can, along with the date and place of sale and name of the current owner if known. You should also include the approximate date at which you acquired each item.

23. Banach stalled sending Flam a list for about two weeks, during which time it is believed Banach may have consulted with counsel. Finally, on August 19, Banach sent two e-mails to Flam, both of which fell far short of the information Flam as Dedalus President rightfully demanded. Banach's first email listed the works she claims to currently allegedly own, and the second listed some, but, as it turned out, not all, of the works she claims to have once allegedly owned and since sold. She claimed that these lists were complete, but for "a few things [she sold] through Ann Freedman at Knoedler Gallery many years ago but I don't have records or images for these."

24. Banach's first email list consisted of six works she claims now to allegedly own and which allegedly are in her possession. What is remarkable is that Banach -- who had all keys and unfettered access to any and all of Motherwell's works, both while he was living, after he died and throughout her 17 years on Dedalus Board -- who was responsible for giving studio inventory numbers to Motherwell's works, who was responsible for cataloging and inventorying Motherwell works, is caught secretly trying to sell undocumented, unrecorded Motherwell works that have no studio inventory numbers and for which Dedalus has no records, 17 years after Motherwell's death, and after 17 years of service on Dedalus' Board. What is even more remarkable is that five of the six works she claimed to own had no studio inventory numbers or any records at all, and Dedalus, of course, therefore had no record of any of these works even existing -- despite that it was Banach's responsibility to assign studio numbers to inventory and catalogue such works, both when Motherwell was alive and subsequently at Dedalus.

25. It is Dedalus' contention that Banach did not come into possession of these works in a rightful manner and that the works belong to Dedalus under the terms of Motherwell's Last Will and Testament. Hence, this action for, inter alia, replevin, unjust enrichment and conversion.

26. The second list consisted of four works which Banach claims to have owned and sold. One was a 1958 drawing, *Untitled (Bird)*, from the same Canson Croquis spiral-bound sketchbook as the two 1958 drawings for which Banach was caught having secretly consigned to Christie's. Not surprisingly, for this Motherwell work, Dedalus again had no studio inventory number, no records, and Banach had failed to disclose her alleged rightful ownership thereof for 17 years, only disclosing after her deception came to light and after having been caught red-handed. Given Banach's responsibility to assign studio inventory numbers for Motherwell works, both while working for Motherwell when he lived, and for Dedalus after his passing, the fact that Dedalus would have absolutely no record of as many as ten (10) Motherwell works that Banach suddenly claims to rightfully own -- notwithstanding that Banach served on the Board for 17 years from 1991-2008 -- evidences a level of dishonesty and secrecy incompatible with rightful ownership and her fiduciary duties.

27. A 1973 *Untitled (Samurai)* painting on paper, also on Banach's "sold" list, similarly failed to have any studio inventory number, and Dedalus had no record of its existence, despite that it was a painting sold for $45,000.00 in November 2005 at Sotheby's. Dedalus only learned of the existence of this work through Sotheby's -- not through its own Board Member Banach -- despite the fact that the Catalogue Raisonné project had, by November 2005, already been seriously underway for the past four years and despite that Banach was an employee paid to work on the Catalogue Raisonné, a Board Member, and on the Catalogue Raisonné Scientific

Committee. Banach's failure to disclose such facts, together with her self-dealing and conflicts of interest, constitute a serious breach of her fiduciary duties.

28. Also on Banach's "sold" list was yet another painting, *The Measure of Things* (1979), which was sold at Christie's in July 2007 for $22,800 (hammer price). Once again the records on this Motherwell work were incomplete and its title was known to Dedalus only from a poorly documented 1983 studio inventory sheet that did not contain any image of the work. There was no studio card at Dedalus. Moreover, the consigner to Christie's, i.e., Banach, refused to respond to inquiries sent to Christie's by Dedalus when it came to auction and when Dedalus sought to learn about the painting's provenance and prior ownership. Banach again, for 17 years, hid this work from Dedalus on whose Board she sat and Banach refused to respond to letters from Dedalus that were forwarded to her by Christie's. Such deceptive, self-interested and fraudulent behavior by Banach constitutes yet another breach of her fiduciary duties.

29. Banach completed her August 19, 2008 email response to Flam by writing, in part, "I sold a few things through Ann Freedman at Knoedler Gallery many years ago but I don't have records or images of these..." Banach's failure to maintain detailed and accurate records of these sales, when she herself was the Dedalus curator primarily responsible for inventorying Motherwell's works for Dedalus and the Catalogue Raisonné Project, constitutes yet another breach of her fiduciary duty. In total, Banach appears to have misappropriated at least ten Motherwell works and admits, after having been caught, to selling at least $93,200 worth of Motherwell's work, without having ever reported any of this information, including the very existence of the works, to Dedalus or to the Board on which she sat, despite requests for, and her fiduciary duty of, full, honest and complete disclosure.

30. In a later e-mail, Banach claimed that all listed works were acquired directly from Motherwell during the years she worked with him in the studio. Yet previously she clearly told Flam that while some of the works were allegedly gifts from Motherwell, others were allegedly purchased by her. Of course, Banach has no documentation supporting either purchases or gifts of any of these works of art. Moreover, Motherwell never sold his works to his employees and Motherwell was very circumspect in the works he gave away, as clearly evidenced by his Last Will and Testament and his circle of professional friends.

31. Motherwell did not gift or sell these works to Banach.

**Additional Works Currently or Formerly Possessed by Banach, Located through Investigation in Anticipation of Litigation**

32. Starting on August 5, 2008, in anticipation of litigation, Flam and Rogers began to investigate the provenance of a number of works sold at auction or by dealers for which there had been no studio cards or that had come to the attention of the Catalogue Raisonné project through auction catalogues or dealers' records. They checked old studio cards and were especially attentive to works that had been described in auction catalogues as having been acquired directly from the artist. Through this investigation in anticipation of litigation, Flam and Rogers uncovered Banach's pattern of secrecy, deception and misappropriation.

33. First, Flam and Rogers learned that Banach had sold another 1958 drawing through Ann Freedman in 1996, also not on Banach's lists. This piece is a private study by Motherwell, likely a "seed" work, and was not a drawing he would have typically gifted to anyone. In breach of her fiduciary duty, Banach hid the existence of the work from Dedalus, and her sale of it.

34. Flam and Rogers further discovered that in 1988, while Motherwell was ill and three years before his death in 1991, Banach had sold a Motherwell 1967 *Open* drawing through the Knoedler Gallery without telling anyone at Motherwell's studio where she was employed at the

time.   Again this work was omitted from Banach's disclosure lists demanded by Flam and Dedalus.   Flam and Rogers further discovered that Banach had also further sold or consigned works on paper through Knoedler in 1996 and 1997.   Despite Banach's responsibilities to catalogue and inventory Motherwell's works, both while she was Motherwell's secretary and after his death, at Dedalus, Banach claims to not have kept any record of these sales; indeed, she failed to do so in breach of her fiduciary duties and despite knowing that Dedalus, with Banach's assistance, was developing a Catalogue Raisonné of Motherwell's work.

35. In addition, one Motherwell drawing and nine Motherwell paintings -- which are much more valuable than drawings or prints -- have been found to have notes on the studio cards, in Banach's own handwriting, which described them as "Destroyed" in 1984. Dedalus does not believe said works are destroyed and claims rightful ownership thereof.   Motherwell was openly and notoriously averse to destroying his own works and he almost never did so.   Heidi Colsman-Freyburger, along with her husband Klaus, worked for Motherwell and lived on his property from 1972 through 1976 and remained friendly until Motherwell's death.   When asked if Motherwell ever destroyed his works, Heidi replied that Motherwell often revised or repainted his works, but that he could never bring himself to destroy them.   Mel Paskell, Motherwell's long time studio assistant, and Richard Rubin, one of Motherwell's closest friends and the Executor of Motherwell's Estate, have also confirmed the same:  so far as is known, Motherwell did not ever destroy his works.

Interview with Mel Paskell, Motherwell's studio assistant

36. On August 16, 2008, Flam interviewed Mel Paskell, Motherwell's studio assistant from 1979 until Motherwell's death.   Paskell and Motherwell worked closely together in the studio on a daily basis, fostering an intimate and trusting relationship.   Notably, despite that close

and intimate working relationship, Paskell was only gifted two (2) unique works of Motherwell and some prints.

37. When asked how Motherwell destroyed his works, Paskell looked puzzled and responded that he never saw or heard of Motherwell destroying any work, and that he was aware of no evidence that any Motherwell work had ever been destroyed by the artist. He stated that "Bob couldn't bring himself to destroy any of his works."

38. In response to the question of whether Paskell remembered Motherwell breaking up spiral bound sketchbooks and framing them with the spiral tabs showing, Paskell stated that this would never happen since Motherwell set great artistic and historical import on his sketchbooks, especially the earlier ones, because they fed and stimulated his ongoing work.

**Elegy Drawing, Located November, 2008**

39. It became clear to Dedalus that Banach had an extensive history of not only hiding Motherwell works that she allegedly owned, but also converting and misappropriating works from Dedalus for her own personal profit. In November 2008, this revelation was yet again confirmed when Dedalus discovered information about yet another drawing that Banach had secretly sold for her personal gain, without disclosing its existence or sale to Dedalus on which she sat as a Board Member.

40. In the course of provenance research at Ameringer-Yohe Fine Art, Jon Lutz of Dedalus' Catalogue Raisonné team received the following information from Miles McEnery of Ameringer-Yohe: A Motherwell work entitled *Elegy Drawing* (1986, ink on paper, 5 x 7 inches, again without any studio inventory number) was consigned by Joan Banach to Ameringer-Yohe on January 30, 2001. It was sold to Mr. and Mrs. Daniel Pekarsky on June 29, 2001, and the Pekarskys sent the Catalogue Raisonné committee a photo of it in 2001. As usual in this case,

Dedalus had no record of the existence of this work from Banach, nor of Banach's alleged ownership thereof. Indeed, this work was also not on the "final" list Banach sent Flam in August, 2008, further evidencing that Banach was placing her interests above Dedalus', in total breach of her fiduciary duties, and subverting the interests of Dedalus by hiding works she misappropriated and/or sold and by hoarding the profits therefrom.

41. By and through Robert Motherwell's Last Will and Testament, Article <u>Seventh</u>, Dedalus owns, *inter alia*, "(i) all works of art created by [Robert Motherwell], other than the selections made pursuant to Article <u>Sixth</u> of this will and (ii) all works of art created by Picabia, Matisse and Noland."

42. Motherwell was very careful and circumspect about the limited works he bequeathed, even to his closest family members, placing sharp limits on the literally handful of paintings he bequeathed, including sharp limits on their value, leaving the entirety of his remaining artwork to Dedalus.

43. Accordingly, when Banach, without authority or right, intentionally exercised control over, or removed or misappropriated or sold or hid Motherwell artwork, whether during Motherwell's lifetime, or after title passed to Dedalus, under the terms of Motherwell's last will and testament, all such artwork rightfully belongs to Dedalus and must be returned. Moreover, Banach is required to disgorge all monies, revenues and profits from her surreptitious and wrongful sales of all Motherwell works.

<u>Banach Intentional Destruction of Dedalus' Computer Information and Data</u>

44. As Banach has predominantly worked from home since at least 1999, Dedalus supplied her with two Apple iMac desktop computers which were purchased by Dedalus for Banach to perform her employment and Board duties.

45. Upon information and belief, Banach used these computers to communicate with various individuals and entities during the course of her employment and Board membership, including individuals and entities residing outside of New York State, and also including those to whom she unlawfully consigned and/or sold Motherwell works without the knowledge or consent of Dedalus.

46. Upon information and belief, both of these computers possessed electronic data owned by Dedalus and which was valuable to Dedalus, including critical information about Motherwell works, their inventory, consignment, sales, purchasers and the whereabouts of Motherwell works.

47. After the termination of Banach's employment with Dedalus, as well as her removal from the Board, Banach no longer had authorization to retain possession, custody or control of both computers and was obligated to return them to Dedalus, together with all of Dedalus' electronic data intact.

48. Dedalus made repeated requests for her to return the computer.    Notwithstanding these requests, Banach maintained the computers in her possession.

49. Banach knowingly and intentionally caused the removal and/or destruction of all relevant data on both of the computers' hard drives, irretrievably wiping the drives clean of all data and information, including all data relevant to this dispute and the allegations set forth herein.

50. When Banach eventually returned the both computers, approximately 6 months after Banach was terminated as an employee and removed from the Board, both hard drives in both of Dedalus' desk top computers were wiped clean and all relevant electronic data was destroyed.

51. Dedalus has expended significant time and money to forensically investigate the destruction of its data on both of the desktop computers which Banach caused.

## FIRST CAUSE OF ACTION
(Breach of Fiduciary Duty as a Member of the Board of Directors)

52. Plaintiff repeats and realleges each of its allegations contained in paragraphs 1 through 51 of the Complaint as if fully set forth herein.

53. As a Member of the Board of Directors of Dedalus Banach had a fiduciary duty to exercise the utmost good faith, candor, undivided loyalty and unqualified honesty in all of her dealings with Dedalus, to not place her interests above those of Dedalus', to avoid all conflicts of interests concerning Dedalus, and to act in Dedalus' best interests.

54. By reason of the foregoing, Banach repeatedly breached her fiduciary duty to Dedalus. Banach misappropriated, sold and/or intentionally and wrongfully exercised control over Dedalus' art works and assets, failed to disclose, for her personal gain, the existence of numerous works owned by Dedalus, failed to give inventory and studio numbers to Motherwell works as part of her fraudulent scheme, and secretly sold and consigned Dedalus' assets in furtherance of her self-interest, and in conflict with the interests of Dedalus.

55. She further breached her fiduciary obligation to Dedalus by failing to disclose that she possessed multiple Motherwell works that she maintained and sold in competition with Dedalus.

56. Banach engaged in a blatant pattern of self-dealing by abusing the trust and confidence of her position as a Board Member and thereby exploited her access to Dedalus' premises, assets, information and art works to enrich herself at Dedalus' expense and damage.

57. Defendant's breach of her fiduciary duties as a Member of the Board of Directors of Dedalus has directly and proximately caused direct, consequential and special damages to

Dedalus in amount to be determined at trial, but in an amount not less than $5,000,000.00, together with punitive damages in an amount to be determined by the trier of fact.

## SECOND CAUSE OF ACTION
### (Replevin)

58. Plaintiff repeats and realleges each of its allegations contained in paragraphs 1 through 57 of the Complaint as if fully set forth herein.

59. Dedalus and/or its founder Robert Motherwell, the interests of which are identical, had clear legal ownership of the Motherwell works at the time Banach exercised unlawful dominion, custody or control over Motherwell works, without authorization.

60. Banach, without authority, intentionally exercised wrongful control over Motherwell artwork owned by Dedalus, in violation of Dedalus' right to possession and ownership of the works, and refused to return the works.

61. As a result of the foregoing, Dedalus is entitled to, and demands, the return of all Motherwell works rightfully owned by Dedalus but subsequently wrongfully seized by Banach.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

62. Plaintiff repeats and realleges each of its allegations in paragraphs 1 through 61 of the Complaint as if fully set forth herein.

63. By reason of the foregoing, Defendant was wrongfully and unjustly enriched in an amount equal to the present value of all works of art misappropriated by her and/or sold by her, together with the value of her salary for the past two and one-half years for which she was paid but later admitted to not even having the necessary working equipment from which to work from home.

64. Defendant unjustly enriched herself at Dedalus' expense.

65. Dedalus is a charitable organization which reposed complete trust, confidence and faith in Banach because of the special and confidential relationship that Banach deceptively fostered with Dedalus. Banach abused her position of trust and confidence and unjustly enriched herself by reason of the foregoing.

66. The circumstances and facts set forth herein are such that in equity and good conscience, Defendant Banach should be (1) compelled to return all Motherwell works to Plaintiff, together with the value of all works she sold, or in the alternative, (2) disgorge and reimburse Dedalus an amount equal to the present day value of all Motherwell works wrongfully misappropriated and/or sold by Banach, and (3) disgorge and reimburse Dedalus in an amount equivalent to her last two and one-half (2½) years salary, in amounts to be proven at trial. To the extent the trier of fact may in good conscience and equity assess punitive and exemplary damages, it should.

## FOURTH CAUSE OF ACTION
(Misappropriation and Diversion of a Corporate Opportunity)

67. Plaintiff repeats and realleges each of its allegations contained in paragraphs 1 through 66 of the Complaint as if fully set forth herein.

68. Dedalus had a significant monetary interest in all Motherwell works it owned, especially where it is a charitable organization the revenues for which are, in part, dependent upon its inventory and where each work therefrom could be sold for substantial monetary profit.

69. Banach misappropriated and otherwise diverted to herself Dedalus' corporate opportunities to sell and/or retain and preserve works sold or misappropriated by Banach without Dedalus' knowledge and consent. Banach abused her role as a Director and employee of the corporation to wrongfully seize Dedalus' opportunity to either sell, or retain and preserve its own

works and instead Banach sold them herself for her profit, at the expense and to the damage of

Dedalus.

70. Banach's misappropriation and diversion of Dedalus' corporate opportunities directly

and proximately caused damages to Dedalus in an amount to be determined at trial, but in an

amount no less than $5,000,000.00, together with punitive, exemplary, special, consequential and

indirect damages to be established at trial.

### FIFTH CAUSE OF ACTION
(Conversion)

71. Plaintiff repeats and realleges each of its allegations contained in paragraphs 1

through 70 of the Complaint as if fully set forth herein.

72. Dedalus had clear legal ownership of the Motherwell works at the time Banach

wrongfully exercised dominion, custody or control over the Motherwell works, without

authorization.

73. Banach, without authority, intentionally and wrongfully exercised control over

Motherwell artwork owned by Dedalus in violation of Dedalus' right to possession and

ownership of the works.

74. The conversion of Motherwell's works proximately caused damage to Dedalus in an

amount to be determined at trial, but in an amount no less than $5,000,000.00, together with

punitive, exemplary, special, consequential and indirect damages to be established at trial.

### SIXTH CAUSE OF ACTION
(Breach of Fiduciary Duty as an Employee)

75. Plaintiff repeats and realleges each of its allegations contained in paragraphs 1

through 74 of the Complaint as if fully set forth herein.

76. A unique and special degree of trust and confidence existed between Banach and Dedalus. Banach, as an employee of Dedalus, was entrusted with unfettered access to all of Motherwell's works and given the responsibility, without supervision, of making sure that his works were properly catalogued and organized.

77. Banach's employment relationship at Dedalus imposed upon Banach a fiduciary duty to exercise the utmost good faith, undivided loyalty and unqualified honesty toward her employer.

78. By reason of the foregoing, Banach breached her fiduciary duty as an employee.

79. Defendant's breach of her fiduciary duties as an employee has directly and proximately caused damages to Dedalus in an amount to be determined at trial, but in an amount no less than $5,000,000.00, together with punitive, exemplary, special, consequential and indirect damages to be established at trial.

## SEVENTH CAUSE OF ACTION
### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

80. Plaintiff repeats and realleges each of its allegations contained in paragraphs 1 through 79 of the Complaint as if fully set forth herein.

81. Banach utilized, at her separate homes, two Apple iMac desktop computers, both of which were purchased and owned by Dedalus, to regularly conduct Foundation business and communicate via the Internet with individuals and entities, including those residing outside of New York State.

82. Banach unlawfully and intentionally retained Dedalus' two computers after she had been discharged as both an employee and a Board member, and after Dedalus had requested the return of both computers. Banach did not have authorization to access the computer for any purpose after the termination of her employment and her removal from the Board.

83. After her termination as an employee and after her removal as a Board member, Banach knowingly and intentionally caused the removal and destruction of all relevant data on both of the computers' hard drives, irretrievably causing the drives to be wiped clean of all relevant data and information, including any and all data relevant to this dispute and the allegations set forth herein. By reason of the foregoing, Banach violated the Computer Fraud and Abuse Act, 18 U.S.C. §1030.

84. Plaintiff has spent considerable monies to forensically investigate both computers attempting to recapture data that was intentionally erased and destroyed and to remedy the damage. As a result, Defendant's violation of the Computer Fraud and Abuse Act recklessly caused damages to Dedalus in an amount to be determined at trial, but in an amount no less than $30,000.00, together with punitive, exemplary, special, consequential and indirect damages to be established at trial.

WHEREFORE, Plaintiff demands judgment as follows:

(a) on the First Cause of Action against Defendant for damages resulting from Defendant's breach of her fiduciary duty as a Director of Dedalus, damages in an amount to be determined at trial, but in an amount no less than $5,000,000.00, together with punitive, exemplary, special, consequential and indirect damages to be established at trial.

(b) on the Second Cause of Action against Defendant for Replevin, the return of all Motherwell works rightfully owned by Dedalus but wrongfully seized by Banach.

(c) on the Third Cause of Action against Defendant for Unjust Enrichment, Defendant Banach should be compelled (1) to return all Motherwell works to Plaintiff, together with the value of all works she sold, or in the alternative, (2) to disgorge her profits

and compensate Dedalus for the present day value of all Motherwell works wrongfully misappropriated and sold by Banach, and (3) to disgorge and reimburse Dedalus $324,874.57 representing her last two and one-half (2½) years salary together with Dedalus' profit sharing contributions, for which she defrauded Dedalus. To the extent the trier of fact may in good conscience and equity assess punitive and exemplary damages, it should.

(d) on the Fourth Cause of Action against Defendant for damages resulting from Defendant's Misappropriation and Diversion of Corporate Opportunities, damages in an amount to be determined at trial, but in an amount no less than $5,000,000.00, together with punitive, exemplary, special, consequential and indirect damages to be established at trial.

(e) on the Fifth Cause of Action for Conversion, damages to Dedalus in an amount to be determined at trial, but in an amount no less than $5,000,000.00, together with punitive, exemplary, special, consequential and indirect damages to be established at trial.

(f) on the Sixth Cause of Action against Defendant for damages resulting from Defendant's breach of fiduciary duty as an employee, damages to Dedalus in an amount to be determined at trial, but in an amount no less than $5,000,000.00, together with punitive, exemplary, special, consequential and indirect damages to be established at trial.

(g) on the Seventh Cause of Action against Defendant for damages resulting from violation of the Computer Fraud and Abuse Act, damages to Dedalus in an amount to be determined at trial, but in an amount no less than $30,000.00, together with

punitive, exemplary, special, consequential and indirect damages to be established at trial.

(h) punitive damages, exemplary, special and indirect damages, reasonable attorneys' fees and such other and further relief as to this Court may deem just, proper and equitable under these facts and circumstances.

Dated: New York, New York
      March 27, 2009

                    PRYOR CASHMAN LLP

                    By: _____

                        Perry M. Amsellem
                        pamsellem@pryorcashman.com
                        Robert W. Ray
                        rray@pryorcashman.com
                        Pryor Cashman, LLP
                        410 Park Avenue
                        New York, New York 10022
                        Telephone: (212) 421-4100
                        Fax: (212) 798-6315

                        Attorneys for Plaintiff